IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs May 5, 2020

**STATE OF TENNESSEE v. WARREN SMITH**

**Appeal from the Criminal Court for Shelby County**
**No. 18-01519      Jennifer J. Mitchell, Judge**

_____

**No. W2019-01882-CCA-R3-CD**

_____

The Defendant, Warren Smith, was convicted by a jury of sexual battery, for which he received a three-year sentence as a Range II, multiple offender.  On appeal, the Defendant argues that there was insufficient evidence to support his conviction because the victim's testimony was incredible and the State failed to establish that the touching was intentional and committed for a sexual purpose.  After review, we conclude that the trial court committed reversible error in constructively amending the indictment in its charge to the jury and that the Defendant's conviction must be reversed and the case remanded for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court**
**Reversed; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

J. Shae Atkinson (on appeal), and John L. Dolan (at trial), Memphis, Tennessee, for the appellant, Warren Smith.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Michael R. McCusker, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

On March 29, 2018, a Shelby County grand jury charged the Defendant with sexual battery of Chelsea Boyd ("the victim"), a Class E felony.  See Tenn. Code Ann. § 39-13-505.  The Defendant proceeded to a jury trial.

At the Defendant's trial, the State adduced the following proof. The victim testified that she worked as a court clerk with the General Sessions Court located at 201 Poplar Avenue in Memphis. She testified that her job duties involved working in the courtroom with different judges and included tasks such as taking dispositions, setting bonds, and working with court dockets. In December 2017, she was performing her duties in Division 25, which she also referred to as "the hearing room on the second floor."

On the morning of December 28, 2017, the victim arrived at her office on the lower level of the building, Room LL-81, around 7:55 a.m. She stated that she gathered her "jackets" for persons who were on the docket that day and headed to court on the second floor. She explained that she went upstairs between 8:00 and 8:10 a.m. but that she later had to return downstairs to retrieve "more dockets." She estimated that by time, it was around 8:45 or 9:00 a.m.

The victim relayed that as she was headed back up to the courtroom, she saw Ms. Maurise McCraw. The victim was friendly with Ms. McCraw; Ms. McCraw was often "outside area 81 . . . giving people hand-outs for a job." The two ladies exchanged pleasantries, and the victim "squatted down" to hug Ms. McCraw, who was seated in a chair. At the same time, Ms. McCraw asked the victim, "Are you having a good day?" and the victim responded, "Yes." The victim explained that "out of nowhere" and while "already bending down to hug" Ms. McCraw, she "was taken aggressively" by the hips, that her "body was formed to stay that way," and that she was "pulled backwards upon a man's penis, private area." Describing it another way, the victim testified,

> He pulled me back, he put both his hands on my waist, . . . and pulled me back and kind of groped his privates, so I felt [his penis] between my private, my behind area. So if I am at the point where he wiggled his body, you know, kind of groped on me, kind of like.

The victim explained that after the man did this to her, he mocked, "Oh, it is a good day." She "kind of pushed him back, like 'Hey, what is going on?'" The victim testified that she did not know the man and that he did not have her permission to engage in this behavior with her. In the courtroom at trial, she identified the Defendant as her assailant.

After the incident, the victim confronted the Defendant, and Ms. McCraw joined in to reprimand the Defendant for his behavior, saying to him, "Don't do that, young man." In response, the Defendant started cursing and accused the victim of assaulting him. According to the victim, the Defendant "started going off saying that [the victim] put [her] body on him, [and] that he was going to file a charge against [her], for putting [her] body on him." The Defendant retorted that "he already had a woman" before he left the area.

- 2 -

The victim confirmed that at the time the incident occurred, the Defendant was walking through the lower level hallway accompanied by another male. The victim was then asked to describe the hallway where this incident occurred; she indicated that when she encountered the Defendant that day, the hallway was not crowded but that "people were passing" by her and Ms. McCraw. The victim explained that four or five "normal size[d]" individuals could "walk shoulder to shoulder through that hallway" and that there was "enough room where if somebody's standing there you could go around, without bumping them." According to the victim, the hallway was "wide enough that if [the Defendant] saw [her,] he could have kept going" without running into her. The victim did not believe that the Defendant's actions were accidental, explaining, "Maybe if you trip and bump into me, that's one thing, but to physically take your hands and pull me to you, that is not an accident."

The victim immediately reported the incident to her supervisor, who told her to inform security. The victim approached "the first deputy that [she] saw," who was Deputy Demetrius Williams of the Shelby County Sheriff's Office. After she explained to Deputy Williams what had happened, she made a formal report with the Sheriff's Department.

On cross-examination, the victim said that she had used the terms hips and waist interchangeably, those indicating the same part of the anatomy to her. When asked if she had ever used the word buttocks in relation to these events, she stated affirmatively, indicating that the Defendant had "rubbed [his penis] up against her butt." She stated that she felt the Defendant's private parts through his clothing and also through her own clothing and that the encounter lasted three to five seconds or even less. In addition, the victim acknowledged that the Defendant never touched her butt with his hands and that he never reached or touched her genital area.

Deputy Williams testified and confirmed that the victim came to him to report this incident on the morning of December 28, 2017. Deputy Williams stated that he developed the Defendant as a suspect; Deputy Williams was familiar with the Defendant, having "dealt with [the Defendant] several times before, [he] just didn't know his name." According to Deputy Williams, he had encountered the Defendant previously that morning, chiding the Defendant about his "being too loud outside the courtroom." Deputy Williams continued,

> Every time I've dealt with this gentlemen he normally has a scent of alcohol, it is always, he's been drinking. So he was actually too loud and I had to go around there and tell him that you're too loud for this building. And we had little words, or whatever, and he will go on and do what he will do and he would leave.

- 3 -

Deputy Williams looked for the Defendant after the victim reported the incident, but to no avail. Deputy Williams indicated that he continued to look for the Defendant over the next few weeks. He testified that he saw the Defendant several times but that he was unable to make contact before the Defendant left the area. After speaking with another deputy, Deputy Williams learned the Defendant's name, and he added the identity of the Defendant to the victim's formal report.

About four weeks later, on January 25, 2018, the victim met with another deputy at the Sheriff's Department to look at some photographs. The victim identified the Defendant from a photo array as the man who assaulted her on December 28; the photo array with the victim's identification was admitted into evidence.

Maurise McCraw testified that she worked as a "public relations and community resource person" at 201 Poplar Avenue and that she was frequently referred to as the "job lady." She identified a photograph of the location where she was sitting in the hallway on the morning of December 28, 2017, and she relayed that she laid out job announcements on the metal chairs in the hallway in order to help people find employment. Describing the hallway, she testified, "It is wide, it is wide, in the lower level it is a wide long width and it is wide and it is long, all the courts are down there." The photograph of the hallway was admitted as an exhibit.

Ms. McCraw recalled that on December 28, 2017, the victim came by her station. Ms. McCraw described that as she was talking with the victim that morning, "this gentleman came by" and "put his hands on [the victim's] posterior." Ms. McCraw explained that the victim sort of "jumped up" or "reared up" in response to the man's actions. Ms. McCraw said to the man, "What are you doing?" and the man continued "down the hall using nasty language." Ms. McCraw encouraged the victim to immediately report the incident, advising, "That's not right, don't let him get away with that."

Following the denial of his motion for a judgment of acquittal, the Defendant testified on his own behalf. The Defendant agreed that "there was an incident" with the victim in the hallway of 201 Poplar Avenue on December 28, 2017, and that Ms. McCraw was present for the encounter. The Defendant said that the "wide" hallway was accurately depicted by the State's photograph, though it was "usually full," and people were present the day this occurred. He maintained that this event did not take place as the victim and Ms. McCraw had described it.

The Defendant explained that he was walking down the hallway with another man and that as they came around a corner, they passed the place where Ms. McCraw had her job flyers displayed; at that time, the victim was bent "over in the aisle" giving Ms. McCraw a hug. The Defendant asserted that the victim "was obstructing a passageway" and that he did see the victim as they rounded the corner. Although the Defendant

conceded that he put his hands on the victim's waist, he claimed that he was "off balance" and only did so because he "had two choices," which were either to push the victim into Ms. McCraw or "catch [his] balance against" the victim. When asked why he "need[ed] to touch [the victim] at all," the Defendant explained that the man he was walking with "stepped around" the victim to look at the job information, causing the Defendant lose his balance and "step[] into" the victim as she was raising up from the hug. The Defendant maintained that the victim turned around and pushed him the after the encounter.

The Defendant indicated that the incident was "real quick" and that he merely "brushed" the victim to brace himself. He denied rubbing his "private genital parts" against the victim's buttocks. He claimed that any touching was accidental and that he had no intention to touch the victim for a sexual purpose. He averred that he was "in a police station" and would not have engaged in such behavior.

When asked whether he cursed at the victim during the encounter, the Defendant responded, "Well, I said some things, we went back and forth. . . . It was more of a confrontation." He continued,

> Well, we walked out. I told her that I had a woman at home and if you push me again I am going to file a civil suit against you. I told her that out loud. And she said something else back. And I said something more, we went back and forth. And the guy that I was with, he said, man don't go back and forth with her. And that lady, right there, she said something that I ain't never even heard.

On cross-examination, the Defendant admitted that he had pled guilty to theft fourteen times. He asserted, however, that he pled guilty on those occasions because he was in fact guilty, whereas here he would not plead guilty "for feeling on [a] strange woman" in a police station when he was not guilty of such.

When asked about the identity of the man he was with in the hallway on December 28, 2017, the Defendant said that he only knew the man by his first name. The Defendant indicated that he grew up in the same area of Memphis as the man and that the man had asked the Defendant "to come in here with him while [the man] paid on his fines." In addition, the Defendant asserted that Deputy Williams never asked him to leave the courtroom area that day.

Following the conclusion of the proof, the Defendant was convicted as charged. Thereafter, the trial court determined that the Defendant was a Range II, multiple offender and imposed a sentence of three years. The Defendant was also ordered to comply with the requirements of the sexual offender registry. After denial of the Defendant's timely motion for new trial, this appeal followed.

ANALYSIS

The Defendant contends that the evidence adduced at trial was insufficient to support his conviction for sexual battery. Specifically, the Defendant submits that the victim's testimony was incredible and that the State failed to establish that the touching was intentional or done for a sexual purpose. He claims that the touching was accidental in accordance with his version of events. The Defendant also submits that the photograph entered as an exhibit by the State was not reliable because it showed an empty hallway and that at the time these events took place, the "hallway was at least moderately busy with people walking past." The State responds that based upon all of the evidence presented, the elements of the offense were established beyond a reasonable doubt.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Tennessee Code Annotated section 39-13-505 defines sexual battery as "unlawful sexual contact with a victim by the defendant or the defendant by a victim" and the contact is accompanied by any of the following circumstances:

(1) Force or coercion is used to accomplish the act;

(2) The sexual contact is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the contact that the victim did not consent;

(3) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; or

(4) The sexual contact is accomplished by fraud.

In other words, the offense of sexual battery can be committed in one of four ways.

The State in its appellate brief argues that subsection (a)(1), which defines sexual battery as "unlawful sexual contact with a victim by the defendant or the defendant by a victim" when "[f]orce or coercion is used to accomplish the act," see Tennessee Code Annotated section 39-13-505(a)(1), is the applicable circumstance for our review. This was the subsection delineated in the indictment. However, the record indicates that the jury was charged under subsection (a)(2), regarding lack of consent. The Defendant did not object to the jury charge as given, either at trial or during the motion for new trial proceedings, and discusses the sufficiency of subsection (a)(2) on appeal.

Here, the indictment charging the Defendant with sexual battery contains the following language, in pertinent part, "[The Defendant] on December 28, 2017, in Shelby County, Tennessee, . . . did unlawfully and intentionally engage in sexual contact with [the victim] by the use of force or coercion, in violation of T[ennessee] C[ode] A[nnotated section] 39-13-505, against the peace and dignity of the State of Tennessee." Although the indictment specifically referred to the force or coercion statutory circumstance, the trial court's jury instruction only included the circumstance pertaining to lack of consent. Specifically, the trial court charged,

For you to find the [D]efendant guilty of [sexual battery], the State must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) the [D]efendant had intentional unlawful sexual contact with the alleged victim in which the [D]efendant intentionally touched the alleged victim's intimate parts, or the clothing covering the immediate area of the alleged victim's intimate parts; and

(2) that the intentional sexual contact was accomplished without the consent of the alleged victim and the [D]efendant knew, or had reason to know, at the time of the contact that the alleged victim did not consent; and

(3) that the [D]efendant acted either intentionally, knowingly or recklessly.

The jury was also instructed on the statutory definitions for sexual contact and intimate parts.

> "Sexual contact" includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]

Tenn. Code Ann. § 39-13-501(6). "'Intimate parts' includes semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" Tenn. Code Ann. § 39-13-501(2).

Although not objected to in the trial court or raised as an issue by either party on appeal, we must conclude that given the posture of this case, the trial court committed reversible error by charging the jury that it could convict the Defendant of sexual battery if it found that the unlawful sexual contact was committed without the victim's consent and that the Defendant knew or had reason to know at the time of the contact that the victim did not consent. When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal. See Tenn. R. App. P. 36(b).

Both the Federal and Tennessee Constitutions guarantee a criminal defendant knowledge of the "nature and cause of the accusation." U.S. Const. amend. VI; see also Tenn. Const. art. I, § 9. This requirement is met when an indictment charging an accused "provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997) (citations omitted). Further, an indictment is statutorily required to "state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." Tenn. Code Ann. § 40-13-202. "[A] defendant cannot legally be convicted of an offense which is not charged in the indictment or which is not a lesser offense embraced in the indictment." State v. Cleveland, 959 S.W.2d 548, 552 (Tenn. 1997) (citing State v. Trusty, 919 S.W.2d 305, 310 (Tenn. 1996)).

This court has held that there must be continuity between the indictment and the evidence presented at trial in order for a conviction to stand. "[N]ot only must the government prove the crime it charges, it must charge the crime it proves," and "after an indictment has been returned, its charge may not be broadened or changed except by action of the grand jury." State v. Goodson, 77 S.W.3d 240, 244 (Tenn. Crim. App. 2001). As this court observed in Goodson,

> [C]ourts [must] distinguish between constructive amendments of the indictment, which are reversible per se, and variances between indictment and proof, which are evaluated under the harmless error doctrine. The accepted test is that a constructive amendment of the indictment occurs when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged. In such cases, reversal is automatic, because the defendant may have been convicted on a ground not charged in the indictment. If, on the other hand, the variation between proof and indictment does not effectively modify an essential element of the offense charged, "the trial court's refusal to restrict the jury charge to the words of the indictment is merely another of the flaws in trial that mar its perfection but do not prejudice the defendant."

Id. (quoting United States v. Adams, 778 F.2d 1117, 1123 (5th Cir. 1985) (internal citations omitted)).

We note that there is no requirement that the State allege a specific theory of liability in order to provide notice to the accused. See State v. Lemacks, 996 S.W.2d 166, 172 (Tenn. 1999). "That being said, by alleging a specific statutory mode of liability, the State was obliged to prove that mode of liability and was precluded from achieving a conviction under a mode of liability different than that alleged in the indictment." State v. Roger W. Christy, No. M2011-00852-CCA-R3-CD, 2012 WL 804064, at *6 (Tenn. Crim. App. Mar. 12, 2012) (citing e.g., State v. Paul Richardson, No. W2008-02506-CCA-R3-CD, 2010 WL 3791973 (Tenn. Crim. App. Sept. 29, 2010); State v. Jamie Roskom, No. M2006-00764-CCA-R3-CD, 2007 WL 432989 (Tenn. Crim. App. Feb. 9, 2007); State v. Atta Najjar, No. W2003-00329-CCA-R3-CD, 2004 WL 123213 (Tenn. Crim. App. Jan. 21, 2004) (parentheticals omitted)). See also State v. Michael Smith, No. W2011-01630-CCA-R3-CD, 2013 WL 3702369, at *7 (Tenn. Crim. App. July 12, 2013). "Because the indictment in this case specifies 'a particular means of committing the offense in the indictment, the defendant was not given proper notice that the jury would be allowed to find him guilty under a different element of the offense.'" Richardson, 2010 WL 3791973, at *9 (quoting Atta Najjar, 2004 WL 123213, at *5).

Furthermore, no amendment occurred prior to trial via Tennessee Rule of Criminal Procedure 7(b)(1). Similarly, nothing in the record suggests that the Defendant consented

to the amendment of the indictment after jeopardy attached. See State v. Stokes, 24 S.W.3d 303, 307 (Tenn. 2000) (stating that in order to comply with the requirements of Tennessee Rule of Criminal Procedure 7(b)(2), "an oral or written motion to amend the indictment should be made, and the defendant's oral or written consent to the motion must be clear on the record").

Here, the State alleged one theory of liability in the indictment—that force or coercion was used to accomplish the unlawful sexual contact—but the trial court included a separate, distinct theory in its charge to the jury—that the unlawful sexual contact was accomplished without the consent of the victim and that the Defendant knew or had reason to know at the time of the contact that the victim did not consent. We conclude that the trial court's erroneous instruction on the applicable statutory circumstance resulted in a constructive amendment to the indictment. See Richardson, 2010 WL 3791973, at *9. As this court explained in Goodson, "reversal is automatic." Goodson, 77 S.W.3d at 245 (quoting Adams, 778 F.2d at 1123). See Christy, 2012 WL 804064, at *7 (concluding that "plain error analysis is not proper because the error . . . results in a void and not merely a voidable conviction"); but see Smith, 2013 WL 3702369, at *6-8 (determining that all five factors for plain error relief were present).

In an effort to determine the proper remedy given our conclusion,[1] as well as in the event that our decision to reverse the Defendant's sexual battery conviction is not upheld by the Tennessee Supreme Court, we will address the sufficiency of the evidence under both the indicted and charged theories. Here, the victim testified that as she was bent over to give Ms. McCraw a hug, the Defendant appeared and aggressively grabbed her by the waist and pulled her body into his and that as he did so, she felt his penis between her buttocks. The victim did not know the Defendant, and she did not give her permission to the Defendant for him engage in this behavior with her. According to the victim, after the Defendant did this to her, he said, "Oh, it is a good day," seemingly in response to Ms. McCraw's question to the victim whether she was having a good day. A victim's testimony alone is sufficient to support a defendant's conviction and requires no corroboration. See State v. Elkins, 102 S.W.3d, 582-83 (Tenn. 2003) (concluding that the evidence was sufficient to support a conviction for rape of a child, despite the fact that the victim's testimony contained some inconsistencies). Moreover, Ms. McCraw testified that the Defendant touched the victim on the posterior and to the exchanged that followed, providing some level of corroboration.

---

[1] This court observed in Christy that the cases from this court reaching similar conclusions requiring reversal have also had different dispositions—some led to dismissal of the charges, while others were remanded for a new trial. See 2012 WL 804064, at *7 (collecting cases). From our assessment, these variations can be explained by the different factual scenarios presented in each case, i.e., the proof presented at trial supporting the various theories of liability at issue.

Based upon this testimony, the jury could find that the Defendant engaged in unlawful sexual contact with the victim without her consent and that he knew or had reason to know at the time of the contact that she did not consent; the jury could also have found that force or coercion was used to accomplish the unlawful sexual contact. The contact was between the Defendant's genital area and the victim's buttocks, constituting an "intentional touching of the clothing covering the immediate area of the victim's [and] the defendant's . . . intimate parts." Tenn. Code Ann. § 39-13-501(6). Moreover, the Defendant's comment, "Oh, it is a good day," provided further evidence that the intentional touching was for the purpose of sexual arousal or gratification.

Relative to the reliability of the photograph, the Defendant testified that the photograph accurately depicted the hallway, though the photograph reflected an empty hallway and others were present the day when this incident occurred. Nonetheless, the jury rejected the Defendant's assertion that the touching was accidental. The Defendant had a lengthy history of theft, and Deputy Williams testified that he had encountered the Defendant previously that morning, chiding the Defendant about his "being too loud outside the courtroom" and their exchanging words. The jury chose instead to accredit the victim's version, as was their prerogative. As we have said time and again, the determination of issues of witness credibility and the resolution of conflicts in their testimony rest squarely within the province of the jury. See Bland, 958 S.W.2d at 659. This court will not substitute our judgment for the finder of fact or disturb its findings in this regard on appeal.

When the evidence is viewed in the light most favorable to the State, a rational juror could have found the Defendant guilty of sexual battery beyond a reasonable doubt under either a theory of force or a theory of lack of consent. We believe that the proper remedy under these circumstances is to reverse the case for a new trial under proper jury instructions. See Smith, 2013 WL 3702369, at *8; Najjar, 2004 WL 123213, at *6.

## CONCLUSION

For the foregoing reasons, the Defendant's conviction for sexual battery is reversed. The case is remanded for a new trial with proper instructions to the jury on the applicable statutory circumstance of force or coercion as referenced in the indictment.


_____

D. KELLY THOMAS, JR., JUDGE


- 11 -